# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

THOMAS A. GOONAN,
Regional Director of the
Fourth Region of the NATIONAL
LABOR RELATIONS BOARD, for
and on behalf of the NATIONAL
LABOR RELATIONS BOARD,

        Petitioner,

   v.

AMERINOX PROCESSING, INC.,

        Amerinox.

UNITED STATES OF AMERICA,

        Intervenor.

1:21-cv-11773-NLH-KMW

**OPINION**

---

**APPEARANCES:**

Lea F. Alvo-Sadiky
Alvina Swati
National Labor Relations Board
Fourth Region
100 Penn Square East, Suite 403
Philadelphia, PA 19107

    *On behalf of Petitioner*

Daniel V. Johns
Kelly T. Kindig
Cozen O'Connor
457 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002

    *On behalf of Respondent*

Christopher D. Dodge
Zachary A. Avallone
Trial Attorneys
United States Department of Justice Civil Division
Federal Programs Branch 1100 L Street NW
Washington, DC 20005

*On behalf of the United States*

**HILLMAN**, District Judge

Presently before the Court is the petition of Thomas A. Goonan, Regional Director of the Fourth Region of the National Labor Relations Board ("Board"), brought pursuant to Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j),[1] for injunctive relief pending the final disposition of the matters pending before the Board on charges against Amerinox Processing, Inc. The Board contends that Amerinox has engaged in, and is currently engaging in, conduct in violation of Section 8(a)(1) and (3) of the Act regarding interference with union activities.

The United States has intervened in this action because of a discrete issue raised by Amerinox in its opposition to the Board's petition. The Court held argument on June 25, 2021, and permitted supplemental briefing.

---

[1] Legislative history and case precedent commonly refer to this section as Section 10(j). Likewise, 29 U.S.C. §§ 157–159 and their subparts are referred to as Sections 7 through 9.

For the reasons expressed at the June 25, 2021 hearing, and for the reasons set forth below, the Court will grant the Board's petition.

**BACKGROUND**[2]

Amerinox is a New Jersey corporation that maintains a facility in Camden, New Jersey, where it processes stainless steel and aluminum by cutting and polishing coils for customers based on particular specifications. In April 2018, Amerinox's employees began an organizing campaign seeking representation by the International Association of Sheet Metal, Air, Rail & Transportation Workers, Sheet Metal Workers Local 19 ("Union"). At that time, the Board contended that Amerinox coerced employees, discharged union supporters, made unlawful statements, and successfully quashed support for the Union. The Board further contended that Amerinox's actions interfered with employee free choice in the union representation petition and the Board set aside the election results. Amerinox's conduct led to a series of administrative complaints and settlement agreements. The last of these was a Formal Settlement approved by the Board on February 4, 2020.

---

[2] The Court recites the background facts from the Board's amended petition (Docket No. 14, 15), its brief in support of its petition (Docket No. 3), and Amerinox's brief in opposition (Docket No. 26).

The Third Circuit enforced the Formal Settlement on April 23, 2020 (Circuit No. 20-1503). As part of the Formal Settlement, the election conducted in Case 04-RC-223800 was set aside and provisions were made for a re-run election. Prior to the scheduling of that election, on May 4, 2020, the Union requested to withdraw its election petition. The Board contends that it was partly because of the COVID-19 pandemic and partly because the Union believed that employees would be unwilling to vote for the Union at that time due to Amerinox's prior actions. The Board approved the withdrawal.

The Board represents that in October 2020, the Union resumed its campaign to organize employees. Eight employees signed Union authorization cards as of October 19, 2020.[3] The Board contends that on that same date, Amerinox forcefully responded to the effort by discharging two main Union adherents - Kyle George and Miguel Gonzalez - and laying off four employees - Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable. Five of the six employees who were terminated had signed Union cards (Venable had not).

---

[3] An authorization is a card or petition signed by an employee indicating his or her desire to form a union at their place of employment. The authorization cards can be signed manually on paper or digitally through a link texted to an employee's cell phone.

The Board claims that these terminations violated the National Labor Relations Act, specifically: Section 7, which guarantees employees the right to form, join, or assist labor organizations and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, 29 U.S.C. § 157; Section 8(a)(1), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of that right," 29 U.S.C. § 158(a)(1); and Section 8(a)(3), which provides that an employer may not discriminate "in regard to hire or tenure or any term or condition of employment to encourage or discourage membership in a labor organization," 29 U.S.C. § 158(a)(3).

Based on these alleged violations of the Act, the Union filed four charges (two on October 30, 2020, another on February 1, 2021, and the fourth on April 8, 2021), which were consolidated for consideration by an Administrative Law Judge of the NLRB. A hearing was held on May 5, 2021. The decision of the ALJ was issued on July 8, 2021.[4]

---

[4] Petitioner's request for injunctive relief is still viable because an ALJ's decision has no final force or effect until acted on by the Board. See Schaub v. West Michigan Plumbing & Heating, Inc., 250 F.3d 962, 968 (6th Cir. 2001); Sharp v. Webco Industries, Inc., 225 F.3d 1130, 1136 (10th Cir. 2000). In accordance with the Board's Rules and Regulations, Sec. 102.46, Respondent has until August 5, 2021 to appeal the ALJ's decision to the Board, in which case Petitioner has the right to file an answering brief and Respondent can then file a reply brief.

On May 26, 2021, the Board filed its instant petition. The Board seeks an injunction pursuant to § 160(j) of the Act, which is typically referred to as a Section 10(j) petition,[5] which authorizes the Board, "upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice," to seek temporary injunctive relief from the United States District Court for the District "wherein the unfair labor practice in question is alleged to have occurred." Specifically, the Board seeks an order from this Court enjoining Amerinox from the following pending final disposition of the NLRB charges: (a) Discharging, laying off, or otherwise discriminating against employees because of employees' support for the Union; (b) Informing employees that it will retaliate

---

[5] Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States . . . within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

against employees because of their support for the Union; (c) Prohibiting employees from discussing a union during working time while permitting them to discuss other subjects unrelated to work; and (d) In any other manner, interfering with, restraining or coercing employees in the exercise of the rights guaranteed in Section 7 of the Act.

The Board also seeks as part of its requested injunctive relief that this Court direct Amerinox to offer immediate reinstatement to Miguel Gonzalez, Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable to their former positions or, if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights and privileges they previously enjoyed.[6]

The Board claims that an injunction is necessary because by the time the Board litigation process concludes, and a remedy is imposed, it will be many months or even years later, and too

---

[6] With regard to this requested relief, the Board relates that only four employees – Soto, Smith, Rodriguez, and Gonzalez – have currently affirmatively expressed a desire to work for Amerinox, but that all five of the discriminatees are entitled to consider offers of interim reinstatement under the protections of a Section 10(j) decree. The Board further relates that it is not seeking an offer of interim reinstatement for George because there are remedial issues relating to his acceptance of a job offer with a new employer prior to his unlawful discharge.

late to revive the Union organizing drive, which Amerinox will have managed to destroy with its unlawful conduct, and the effects of which will be permanent unless temporary injunctive relief is granted to safeguard the Board's remedial powers. Petitioner further claims that after the mass discharge/layoff on October 19, 2020, the Union was only able to garner one additional digital union authorization card on November 2, 2020, and none thereafter through February 2021. Following the terminations of the six employees, the Union was unable to get employees to talk to them while at Amerinox's facility. Recently, as the hearing date on the underlying unfair-labor-practice charges approached, the Board contends that a few employees have been willing to speak to the Union but they have been unwilling to be seen talking to the Union.

Amerinox, not surprisingly, tells a different story. Amerinox sets forth what it contends are the legitimate business reasons for the termination of these six employees. For Kyle George, Amerinox relates that not only did George misprocess a significant customer order in October 2020 causing Amerinox almost a quarter of a million dollars to settle the matter with its customer, George gave his two-weeks' notice to Amerinox on October 19, 2020 that he was leaving his employment for another position with a different employer. As for Miguel Gonzalez,

Amerinox relates that on October 15, 2020, Gonzalez got into an altercation with a co-worker.  Seth Young, Amerinox's president and owner, determined that Gonzalez should be terminated for violating Amerinox's workplace violence policy, and that when he made the decision to terminate Gonzalez, he was unaware of any of Gonzalez's alleged union activities.

Amerinox relates that the other four employees - Andrew Rodriguez, Keon Smith, Joseph Soto, and Bernard Venable - were laid off due to the impact of COVID-19.  Amerinox states that between March and October 2020, Amerinox lost approximately $1 million, and that October 2020 was especially "horrific" financially.  Amerinox determined that it needed to further reduce employee headcount, and it prepared an internal memo which identified seven employees considered for layoff, and the reasons each was considered for layoff.  Amerinox contends that when Young decided to conduct the layoffs on October 19, 2020, he "had zero knowledge of any text or cards or that there was anything going on" with the Union.

In its overriding argument against the Board's request for an injunction, Amerinox contends that even putting aside the circumstances of the six employees' terminations, the Union has not presented evidence to show that the unionizing activities have been suppressed, which is the critical determination as to

whether a Section 10(j) injunction should be imposed. With regard to the Union's alleged unsuccessful efforts to engage Amerinox's workers, Amerinox points out that in 2018, the Union attempted to organize Amerinox's employees, led by the Union's area marketing representative, Robert Gadsby. A secret ballot election was held near the end of 2018, and the Union lost. Amerinox further points out that there is no evidence that the Union did anything to attempt to organize Amerinox's employees between April/May 2020 through October 2020.

Amerinox points out that Gadsby testified that even though there was a period of time when it appeared the organizational campaign had slowed, it has since picked back up and now is "steady." Gadsby has met in person with current Amerinox employees at the Collingswood Diner, and has met with Amerinox employees several times since the October 2020 layoffs, including as recently as a few weeks before the administrative hearing in early May 2021. Gadsby also testified that he has had ongoing contact with current Amerinox employees related to the Union's attempt to organize employees at Amerinox, including exchanging texts with those employees from at least February 2021 through the weeks leading up to the administrative hearing in May 2021. Moreover, Gadsby testified that the level of

interest among Amerinox employees not only has picked back up, but has been steady at least as of February 2021.

In addition to arguing that the timing of the Board's petition demonstrates that injunctive relief is not warranted, as the Board has delayed seven months in filing this action, Amerinox argues that the lack of Union-chilling activities undermines the Board's request for injunctive relief.

In addition to directly opposing the Board's position that it is entitled to its requested relief pending the final resolution of the Board's charges,[7] Amerinox also contends that the Board has no power to bring the petition for injunctive relief because the Acting General Counsel of the NLRB, who filed the amended petition on behalf of petitioner, lacks authority to prosecute this matter due to the improper removal of General Counsel Peter B. Robb in January 2021. Amerinox contends that

---

[7] This Court has a very limited role in the NLRB process. Once the Board issues a final decision, either the Board or any other "person aggrieved" by the Board's order files a petition for review before the relevant circuit court of appeals, and then, if necessary, before the United States Supreme Court. See Atlantic City Electric Company v. National Labor Relations Board, --- F. 4th ---, 2021 WL 2817009, at *2 (3d Cir. 2021) (citing 29 U.S.C. §§ 160(e), (f)). A district court's only involvement in the NLRB process is a Section 10(j) petition for an injunction pending the Board's final order. 29 U.S.C. § 160(j), supra note 4; cf. id. § 160(e) (providing that one rare exception is "if all the courts of appeals to which application may be made are in vacation" may the Board seek review of a final order before the district court).

the removal of a lawfully appointed sitting General Counsel of a quasi-judicial independent government agency was not in accord with the Act and compromised the NLRB's ability to operate independently. Amerinox further argues that the appointment of an Acting General Counsel circumvented the Appointments Clause of the U.S. Constitution and the Federal Vacancies Reform Act.

The United States intervened because of this argument, and both the Board and the United States have argued that Amerinox's position is without merit. Following the parties' briefing, including that of the United States as a consented-to intervenor, this Court held oral argument on the Board's petition on June 25, 2021, and permitted supplemental briefing. As stated above, during the pendency of this matter, the ALJ issued his decision on July 8, 2021. The parties filed supplemental letters regarding the impact of this decision, which the Court has also considered.

**DISCUSSION**

### A. Subject matter jurisdiction

This Court has subject matter jurisdiction over this matter pursuant Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j).

**B. Analysis**

As a preliminary matter, the Court must first briefly address Amerinox's challenges to the propriety of the Board's petition based on the circumstances of the removal of the former General Counsel to the NLRB, and the prosecution of the matter by the Acting General Counsel. As set forth by the United States, in the NLRA Congress created two separate offices within the NLRB subject to presidential appointment and senate confirmation: Members of the Board, 29 U.S.C. § 153(a),[8] and the General Counsel, 29 U.S.C. § 153(d).[9] Congress provided that the

---

[8] 29 U.S.C. § 153(a) provides:

> The National Labor Relations Board (hereinafter called the "Board") created by this subchapter prior to its amendment by the Labor Management Relations Act, 1947 [29 U.S.C. 141 et seq.], is continued as an agency of the United States, except that the Board shall consist of five instead of three members, appointed by the President by and with the advice and consent of the Senate. Of the two additional members so provided for, one shall be appointed for a term of five years and the other for a term of two years. Their successors, and the successors of the other members, shall be appointed for terms of five years each, excepting that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed. The President shall designate one member to serve as Chairman of the Board. Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.

[9] 29 U.S.C. § 153(d) provides,

> There shall be a General Counsel of the Board who shall be appointed by the President, by and with the advice and

persons appointed to the Board "may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). Congress did not include the same provision for the General Counsel. Id. § 153(d).

Based on the plain language of these provisions, the President may relieve the General Counsel of his or her duties without the process required for Board members. This prerogative of the President also demonstrates that the temporary assignment of an Acting General Counsel without compliance with the Appointments Clause[10] or other laws, such as

_____

consent of the Senate, for a term of four years. The General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board (other than administrative law judges and legal assistants to Board members) and over the officers and employees in the regional offices. He shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law. In case of a vacancy in the office of the General Counsel the President is authorized to designate the officer or employee who shall act as General Counsel during such vacancy, but no person or persons so designated shall so act (1) for more than forty days when the Congress is in session unless a nomination to fill such vacancy shall have been submitted to the Senate, or (2) after the adjournment sine die of the session of the Senate in which such nomination was submitted.

[10] The U.S. Constitution's Appointments Clause, provides in relevant part: "[The President] . . . shall nominate, and by and

Federal Vacancies Reform Act,[11] does not render the Section 10(j) petition invalid.  Indeed, the Act itself provides for the designation of an Acting General Counsel when the General Counsel's position becomes vacant, however that vacancy came to be.  See 29 U.S.C. § 153(d), *supra* note 9.

Moreover, a Section 10(j) petition for an injunction is brought by the Board, not the General Counsel.  That statute provides:

- "The Board is empowered . . . to prevent any person from engaging in any unfair labor practice . . . ."  29 U.S.C. § 160(a).

- "The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."  Id. § 160(j).

---

with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law . . . ."  U.S. CONST., art. II, § 2, cl. 2.

[11] The Federal Vacancies Reform Act of 1998 (Vacancies Reform Act), Pub. L. No. 105 -277, Div. C, tit. 1, § 151, 112 Stat. 2681-611-16, codified at 5 U.S.C. §§ 3345-3349d, provides for the temporary filling of vacant executive agency positions that require presidential appointment with Senate confirmation.

The Board, through its Regional Director, Thomas Goonan, and under its power to "to prevent any person from engaging in any unfair labor practice," brought a petition before this Court pursuant to § 160(j).[12]  In compliance with § 160(j), this Court

---

[12] The Court recognizes that the "General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board," and "[h]e shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law."  29 U.S.C. § 153(d).  The duties of the General Counsel, however, regarding the investigation and institution of a charge is separate from the final decision of the Board on that charge.  See NLRB Rules and Regulation, Sec. 102.45 ("Upon the filing of the [ALJ's] decision, the Board shall enter an order transferring the case to the Board and shall serve copies of the order, setting forth the date of such transfer, on all the parties."); id. Sec. 102.46 ("Within 28 days, or within such further period as the Board may allow, from the date of the service of the order transferring the case to the Board, pursuant to section 102.45, any party may . . . file with the Board in Washington, D.C., exceptions to the administrative law judge's decision or to any other part of the record or proceedings (including rulings upon all motions or objections), together with a brief in support of said exceptions."); id. Sec. 102.48(a) ("In the event no timely or proper exceptions are filed as herein provided, the findings, conclusions, and recommendations contained in the administrative law judge's decision shall, pursuant to section 10(c) of the Act, automatically become the decision and order of the Board and become its findings, conclusions, and order, and all objections and exceptions thereto shall be deemed waived for all purposes."); id. Sec. 102.48(b) ("Upon the filing of timely and proper exceptions, and any cross-exceptions or answering briefs, as provided in section 102.46, the Board may decide the matter forthwith upon the record, or after oral argument, or may reopen the record and receive further evidence before a Member of the Board or other Board agent or agency, or may make other disposition of the case.").

must determine whether to "grant *to the Board* such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j) (emphasis added). In sum, because the authority to bring this petition is vested by statute with the Board - individuals appointed and confirmed as the Constitution requires – this Court has jurisdiction to hear and adjudicate this Petition.

To that end, this Court is tasked with deciding two narrow issues in considering a § 160(j)/Section 10(j) petition for an injunction. The Court "need not, indeed should not, make a finding of employer motivation." <u>Eisenberg for and on Behalf of N.L.R.B. v. Wellington Hall Nursing Home, Inc.</u>, 651 F.2d 902, 906 (3d Cir. 1981). Instead, this Court's determination of whether to issue temporary injunctive relief under Section 10(j) involves a two-fold inquiry: (1) whether there is reasonable cause to believe that an unfair labor practice has occurred; and (2) whether an injunction would be just and proper. <u>Hirsch v. Dorsey Trailers, Inc.</u>, 147 F.3d 243, 247 (3d Cir. 1998). "Under this inquiry, the court determines whether an injunction is necessary to preserve the Board's remedial powers, which incorporates a weighing of relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief, along with the public

interests implicated by the labor disputes." <u>Chester ex rel.</u>
<u>N.L.R.B. v. Grane Healthcare Co.</u>, 666 F.3d 87, 98–99 (3d Cir.
2011).

### (1) *Whether there is reasonable cause to believe that an unfair labor practice has occurred*

This Court finds that the Board has established the first
prong of the two-part test.  The "reasonable cause" inquiry
requires a court to examine whether the Board's legal theory is
"substantial and non-frivolous," <u>Chester ex rel. N.L.R.B. v.</u>
<u>Grane Healthcare Co.</u>, 666 F.3d 87, 101 (3d Cir. 2011), which is
a "low threshold of proof," <u>Kobell v. Suburban Lines, Inc.</u>, 731
F.2d 1076, 1084 (3d Cir. 1984).  After a hearing and an
opportunity for Respondent to be heard, the ALJ found:

> 2. Respondent violated Section 8(a)(1) of the Act by
> telling employees they were not permitted to talk about the
> Union during working time, although Respondent permitted
> employees to talk about other nonwork topics during working
> time.

> 3. Respondent violated Section 8(a)(1) of the Act by
> threatening employees with discharge if they supported the
> Union or engaged in Union activity.

> 4. Respondent violated Section 8(a)(1) of the Act by
> (i) telling an employee that the employee was being
> discharged because of the employee's support for the Union;
> and (ii) by creating the impression among its employees
> that their Union activities were under surveillance by
> Respondent.

> 5. Respondent violated Section 8(a)(3) and (1) of the
> Act when it discharged its employee Miguel "Taz" Gonzalez
> because he formed, joined, or assisted the Union and

engaged in concerted activities, and to discourage
employees from engaging in these activities.

6. Respondent violated Section 8(a)(3) and (1) of the
Act when it immediately separated its employee Kyle George,
rather than allowing him to work his final two weeks,
because he formed, joined, or assisted the Union and
engaged in concerted activities, and to discourage
employees from engaging in these activities.

7. Respondent violated Section 8(a)(3) and (1) of the
Act when it laid off its employees Andrew Rodriguez, Joseph
Soto, Keon Smith, and Bernard Venable because Respondent's
employees formed, joined, or assisted the Union and engaged
in concerted activities, and to discourage employees from
engaging in these activities.

8. The unfair labor practices described above affect
commerce within the meaning of Section 2(6) and (7) of the
Act.

(Docket No. 46-1 at 21-22.)[13]

The ALJ's recent decision finding extensive unfair labor

practices,[14] which is based on the same record before this Court

_____

[13] As discussed more below, the ALJ ordered, among other relief,
that Amerinox is required to offer full reinstatement to Miguel
Gonzalez, Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard
Venable, and that Amerinox make whole Kyle George, Miguel
Gonzalez, Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard
Venable for any loss of earnings and other benefits.  (Docket
No. 46-1 at 25.)

[14] This Court may consider the substance of the ALJ's decision,
which was issued after briefing and oral argument on the Board's
petition, but prior to the issuance of this Opinion.  See, e.g.,
Moore-Duncan ex rel. N.L.R.B. v. Aldworth Co., Inc., 124 F.
Supp. 2d 268, 274 (D.N.J. 2000) ("This Court has reviewed the
extensive record in this case, including the transcripts of
proceedings and other evidence before Administrative Law Judge
William G. Kocol, and Judge Kocol's Opinion of April 20, 2000,
detailing his findings that the respondents had committed
substantial unfair labor practices surrounding union organizing

and which this Court has reviewed,[15] confirms that the Board has readily met the "low threshold" "reasonable cause" element.

## (2) *Whether an injunction would be just and proper*

The Board has also met the second prong to warrant injunctive relief. Whether the imposition of an injunction pending the final resolution of the Union's charges would be "just and proper" focuses on the Board's ability to "facilitate peaceful management-labor negotiation." Hirsch, 147 F.3d at 247 (citing Vibra Screw, 904 F.2d at 879 ("[T]he critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired.")).

In evaluating the net benefits of injunctive relief, the courts weigh the relative harms it may prevent against the harms it may produce. Id. That includes evaluating how "the chilling effect of management retaliation may outlast the curative

_____

activities and a certification election conducted September 19, 1998. The essential issue under section 10(j) is whether this Court should grant a temporary injunction compelling the respondents to take steps to ameliorate their alleged unfair labor practices pending final determination by the NLRB upon review of ALJ Kocol's decision.").

[15] See Docket No. 23, ORDER granting Petitioner's Motion to Try Petition for Temporary Injunction on the Basis of the Record Developed before the Administrative Law Judge. Amerinox did not oppose this motion.

effects of any remedial action the Board might take . . . ."
Id. (citation omitted).  It also includes weighing not only the
harms to the Board, but also the harms injunctive relief poses
to the employer.  Id. (citation omitted).

In this case, the Board argues that an injunction is just
and proper because:  "The leaders of the campaign have been
illegally removed from the workplace.  The employees are afraid
and the campaign has effectively ground to a halt.  The Union
quickly secured eight cards prior to the mass discharge
on October 19.  After the discharges, the Union has had
difficulty communicating with the employees and . . . card
signing slowed to a trickle, despite the Union going to the
facility about twice a week.  The Union received only
four cards between October 20 and November 2, as well as one
card that was undated, and two additional cards in March 2021,
despite continuing fear."  (Docket No. 3 at 53.)

The Court recognizes Amerinox's contrasting position that
the "mass discharge" of union activists did not impact the
Union's efforts because of the following: the Union was able to
obtain four cards in the two weeks after the terminations; even
though there was a period of time when it appeared that the
organizational campaign had slowed, it has since picked back up
and now is "steady"; Gadsby has met in person with current

Amerinox employees at the Collingswood Diner; he has met with Amerinox employees several times since the October 2020 layoffs, including as recently as a few weeks before the administrative hearing in early May 2021; he has had ongoing contact with current Amerinox employees related to the Union's attempt to organize employees at Amerinox; he has exchanged texts with those employees from at least February 2021 through the weeks leading up to the administrative hearing in May 2021; the Board does not provide evidence from current Amerinox employees who have expressed that fear of retaliation by Amerinox is the reason they have not signed the Union authorization cards, rather than a lack of interest by employees in joining the Union; and the Board waited seven months to file its petition.[16]

The Court finds, however, that despite the above-outlined Union communications with Amerinox employees and the recent signing of additional authorization cards, the Board has demonstrated on the record as a whole that Amerinox's acrimonious history with the Union and the termination of employees who have expressed support for the union, is likely to

---

[16] The Court notes that a delay in initiating a Section 10(j) petition does not on its own preclude injunctive relief. (See Docket No. 30 at 19, citing cases.)

have, and continues to have, a substantial chilling effect on its employees' unionizing activities.

The ALJ noted that an employer's rules and policies that prohibit employees from disclosing or discussing their wage rate or salary violate the Act, and the ALJ found that Amerinox violated Section 8(a)(1) between June 1, 2020 and March 30, 2021, by maintaining rules in Sections L and V of its Employee Manual and its Progressive Disciplinary Policy that prohibit employees from disclosing information about wages, benefits, and other terms and conditions of employment. (Docket No. 46-1 at 21.) Although after March 30, 2021, Amerinox revised and reissued both documents to include acceptable language, this Court finds that the chilling effect of those provisions is likely to have persisted since then and continues today. This finding is supported by the ALJ's July 8, 2021 order, which directed that Amerinox was to immediately provide employees with inserts or revised versions for the current Employee Manual and current Progressive Disciplinary Policy that advises that the unlawful provisions have been rescinded, or provides a lawfully worded provision on adhesive backing that will cover the unlawful provisions. (Id. at 23.)

The ALJ's decision also supports the finding that Amerinox's actions have likely chilled, and continue to chill,

its employees' union activities.  The ALJ found that in addition

to providing employees with revised versions of the Employee

Manual and Progressive Disciplinary Policy, additional remedies

were necessary to fully dissipate the coercive effect of

unlawful discharges and layoffs and other unfair labor

practices, including a notice reading and the entry of a broad

cease and desist order.[17]  (Id.)  The ALJ found that a notice

reading was appropriate where, as here, the employer's

violations are serious enough that a reading is warranted to

reduce the chilling effect of the violations on employees'

willingness to exercise their Section 7 rights.  (Id. at 23-24.)

The ALJ found that Amerinox "committed serious violations,

including threats from the company president that he would

destroy those who support the Union and later a mass

separation/layoff of over 60 percent of the Union supporters

immediately upon learning of the renewed organizing efforts,"

and that Amerinox "has a history of serious violations during

the prior organizing effort."  (Id. at 24.)  The ALJ recommended

that Amerinox should be required to hold a mandatory employee

meeting on working time to ensure the widest possible employee

---

[17] The ALJ noted that the additional remedies also included
notice mailing, providing the Union with employees' contact
information and access to Amerinox's bulletin board, and access
to Amerinox's facility.  (Docket No. 46-1 at 23.)  The ALJ did
not order these additional remedies.

attendance, at which Amerinox representatives would read aloud the notice to employees.

The ALJ further found that the serious unfair labor practices in this case, in combination with the numerous violations addressed in the prior formal settlement, demonstrated a general disregard for Amerinox's employees' fundamental Section 7 rights, and consequently a broad cease-and-desist remedy was warranted and would best effectuate the remedial purposes of the Act.  (Id. at 24.)

Accordingly, the ALJ ordered the following relief that Amerinox:

1. Cease and desist from:

(a) Discharging, laying off, or otherwise discriminating against employees because of their support for a union or because other employees support a union.

(b) Creating the impression that it is engaged in surveillance of its employees' union or other organizational activities.

(c) Threatening employees with discharge or other retaliation if you choose to be represented by or support a union.

(d) Prohibiting employees from discussing a union during working time while permitting them to discuss other subjects unrelated to work.

(e) Telling employees they are being separated because of their support for a union.

(f) Maintaining work rules that prohibit employees from discussing their wages, benefits, or other terms or conditions of employment.

(g) In any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

(Id. at 25.)

This Court recognizes that the ALJ did not explicitly consider the two-prong test for a Section 10(j) petition for injunctive relief that this Court must assess. But the ALJ considered the same administrative record as presented to this Court,[18] and this Court cannot overlook the significance of the ALJ's findings that Amerinox's current union-chilling conduct requires the immediate imposition of a notice reading and a cease-and-desist order.

Similarly, in determining whether Section 10(j) injunction is warranted, the Court must consider the individual relief the ALJ afforded to the discharged employees. The ALJ ordered, among other relief, that Amerinox is required to offer full reinstatement to Miguel Gonzalez, Andrew Rodriguez, Joseph Soto, Keon Smith, and Bernard Venable. (Docket No. 46-1 at 25.) Part of the Board's request for injunctive relief here is the offer of interim reinstatement to these same employees.

The Court recognizes that the focus of a Section 10(j) petition for injunctive relief is on the Board's efforts to

---

[18] See, *infra*, note 13.

facilitate peaceful management-labor negotiation, and not to provide redress to a discharged employee individually, which is a major focus of the ALJ's decision. See Eisenberg for and on Behalf of N. L. R. B. v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 906-07 (3d Cir. 1981) (explaining that "[w]hen the Board files an application for such relief it is not acting on behalf of individual employees, but in the public interest"). Where, however, "union supporters are excluded from the bargaining process pending resolution of unfair labor practice charges, the position of the designated bargaining representative will in all likelihood be substantially undermined, [and] all members of the bargaining unit may be affected by such an erosion of union support." Id.

Here, the offer of interim reinstatement of the discharged employees who were all terminated on the same day contemporaneous with their union activities will serve to ameliorate the "harms to the bargaining process [and] employees' rights," "restore the status quo" and serve "the public interests implicated by the labor disputes." Grane Healthcare Co., 666 F.3d at 98-99. Additionally, Amerinox has not expressly articulated what harm it will suffer if the Court grants the Board's requested relief. See Hirsch, 147 F.3d at 247 (explaining that in evaluating the net benefits of

injunctive relief, a court must weigh not only the harms to the Board, but also the harms injunctive relief poses to the employer).

Consequently, the Court finds that the "issuance of an injunction is 'just and proper,' i.e., that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board." <u>Lenape Products</u>, 781 F.2d at 1003. The Court will issue an injunction which includes enjoining Amerinox from engaging in any actions relative to its employees' union activities, ordering that Amerinox offer interim reinstatement to the five affected employees, posting notice, and holding a reading of the notice.[19]

_____

[19] In its petition, the Board requests that the Court order Amerinox to: "Supply the Union, upon its request, with the full names, work locations, shifts, job classifications and home addresses for the following employees: All full-time and regular part-time shipping/receiving employees, production and maintenance employees employed by Respondent at its 2201 Mount Ephraim Avenue, Camden, New Jersey facility." (Docket No. 14 at 9.) The ALJ denied this relief, finding, "The Union, however, does not lack the ability to access Respondent's employees. Gadsby was able to communicate with several employees with the information he had, and the discriminatees, once reinstated, will be a to communicate with coworkers. I, therefore, see no need for these additional remedies under the circumstances." (Docket No. 46-1 at 24 n.36.) Amerinox also opposed this relief in its opposition to the Board's petition for the same reasons. Because the Board has not expressly contested these reasons of the ALJ and Amerinox, the Court will decline to grant that relief.

**CONCLUSION**

Even though this Court finds that a Section 10(j) injunction is warranted at this time, the Court trusts that the administrative process will still continue expeditiously. As the Third Circuit has observed, a Section 10(j) injunction may only last six months, with limited extensions. The Third Circuit has further observed:

> Overworked courts understand and are sensitive to the problems of overworked administrative agencies. But courts should and do give priority to matters of great urgency, particularly those in which need for relief is said to be so great as to justify the extraordinary remedy of temporary injunction. By the same token we think the administrative sense of urgency that leads to a suit for temporary injunctive relief under Section 10(j) should not abate once an injunction issues. Rather, the administrative law judge and, after him, the Board should hear and dispose of the controversy expeditiously. Indeed, we think a pledge of expeditious administrative action is necessarily implicit in a petition for a Section 10(j) injunction. Otherwise, a temporary injunction, entered without reaching the ultimate merits of a dispute may become, in effect, a final disposition of the controversy.

Hartz Mountain, 519 F.2d at 144.

Thus, for the reasons expressed above, the Court will grant the Board's petition for an injunction under Section 10(j) of the National Labor Relations Act, with an appropriate Order to be entered.


Date: __July 14, 2021__          ____s/ Noel L. Hillman_____
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.